```
                      UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,            )  Criminal Action
                                     )  No. 21-581
vs.                                  )
                                     )
JACOB KYLE WIEDRICH,                 )  January 19, 2022
                                     )  11:01 a.m.
                 Defendant.          )  Washington, D.C.
                                     )
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE THOMAS F. HOGAN,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

*(Parties appearing via videoconference and/or telephonically.)*

<u>APPEARANCES</u>:

```
FOR THE UNITED STATES: JACOB STRAIN
                       DOJ-USAO
                       111 South Main Street
                       Salt Lake City, UT 84111
                       (801) 325-3285
                       Email: jacob.strain@usdoj.gov


FOR THE DEFENDANT:  MARIA JACOB
                    Office of the Federal Public Defender
                    625 Indiana Ave, N.W.
                    Washington, DC 20004
                    (202) 208-7500
                    Email: maria_jacob@fd.org


ALSO PRESENT:       JESSICA REICHLER, U.S. Probation


Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter
```

*This hearing was held via videoconference and*
*telephonically and is, therefore, subject to the limitations*
*associated with the use of technology, static interference, etc.*

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1              **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Your Honor, we are ready to

3     proceed with this matter.

4              THE COURT:  All right.  Thank you.

5              THE COURTROOM DEPUTY:  This is Criminal Case

6     21-581, United States of America versus Jacob Kyle Wiedrich.

7              On behalf of probation we have Jessica Reichler.

8              Counsel, please identify yourselves for the

9     record, beginning with the government.

10             MR. STRAIN:  Good morning, everyone.

11    Jacob Strain for the United States.

12             THE COURT:  Good morning.

13             MS. JACOB:  Good morning, Your Honor.

14    Maria Jacob, on behalf of Mr. Wiedrich who is here present

15    by video.

16             THE COURT:  All right.  Thank you.

17             Mr. Wiedrich, you can hear everybody?

18             Can you hear us, sir?  Mr. Wiedrich?

19             THE DEFENDANT:  I apologize.  Yes, I can, Your

20    Honor.

21             THE COURT:  Thank you.

22             All right.  The presentence report has been filed

23    in this case, so thank you.

24             All right.  We're here this afternoon for the

25    sentencing of Mr. Wiedrich.  I have received presentence

1    memos about the sentencing from the government and from

2    defense counsel.

3           I have received some letters attached to his

4    filing by his family, from his --

5           (Automated AT&T operator telephone interruption.)

6           AT&T OPERATOR:  You are muted --

7           THE COURT:  I have had an opportunity to talk to

8    Ms. Reichler about the presentence report, and the issues

9    contained therein.

10           I have, also, obviously reviewed the plea

11    agreement and the materials related to the plea agreement,

12    including his actions; all of the materials filed by the

13    government as to his participation in the January 6th riot,

14    and his postings thereafter.

15           I understand there are no objections -- and I will

16    ask counsel if that is correct -- to the factual predicate

17    that is set forth in the presentence report.

18           Government first.

19           MR. STRAIN:  That's correct, Judge.

20           THE COURT:  Ms. Jacob?

21           MS. JACOB:  That is correct, Your Honor.

22           THE COURT:  All right.  The presentence report I

23    am accepting as given.

24           The issue before the Court obviously,

25    Mr. Wiedrich, is an appropriate sentencing in the context of

1    the offense which you pled guilty to, what happened, and

2    your position at this time.

3         This actually presents some difficulty for the

4    Court in the following circumstance:  The government has

5    suggested a proper sentence would be an incarceration

6    period -- some time period, not long -- and then probation

7    added to that sentence.

8         Your counsel objected that would not be a legal

9    sentence for a Class B misdemeanor; and it's not appropriate

10   to have an incarceration sentence, and then probation

11   following.

12        That was answered in a Fourth Circuit published

13   opinion, and referenced by -- two other judges in this court

14   considered that; the Chief Judge, who denied it after the

15   government's request and further briefing, I believe, and --

16   at least there were questions about it; and Judge Kotelly

17   had a sentence, and added onto that process -- and then had

18   asked for further briefing now that there had been a request

19   to review that.  It remains undecided.

20        I have reviewed the context of the request from

21   the government to have an incarcerated sentence --

22   incarceration, plus probation -- and I am going to find the

23   authority they rely upon, to me, is not sufficient at this

24   time.  And I am not going to follow the government's request

25   to have a sentence of confinement followed by probation; I

1    believe it is not available under the statutory framework of

2    the sentencing laws for a Class B misdemeanor -- is not

3    appropriate.  I think that's a gap in our sentencing.  I

4    think the process would be much better served if we had that

5    type of sentencing available; but I find I do not believe it

6    is available under the law.

7          I am not going to go through and state the

8    government's case.  I am relying on the Fourth Circuit, and

9    other statutory arguments related to that; but I am simply

10   finding I don't think it is appropriate under these

11   circumstances.

12         That being the case, I am limited to giving jail

13   time with no probation or giving another sentence of home

14   incarceration or home detention, with a distinction between

15   the two, and a probationary sentence.

16         I would like to hear each side's input as to the

17   sentence that they've recommended.  And the government

18   originally recommended a sentence of imprisonment, followed

19   by probation.  But on the grounds that I do not believe that

20   I have the authority to do that, the government has to make

21   an appropriate sentence under those circumstances.  The

22   defense can articulate what they think is appropriate.

23         My concern is as follows -- so you understand what

24   I am worried about -- is that Mr. Wiedrich has, I think,

25   somewhat immaturely -- it seemed by the videos, from what

1    I've reviewed that the government suggested I look at --

2    cheered on this revolt; cheered on this attack; cheered on

3    the assault, the attack on the police -- saw that conduct

4    being done; went ahead with it, followed through, was

5    cheering it.

6         And then the video subsequent -- the next day,

7    after reflecting, was very proud of what had happened; he

8    thought it was appropriate.  His statement was it was

9    different from the Black Lives Movement, which was a violent

10   attack on the police, and that's not what happened in this

11   riot.  Now that did not seem to be acceptance of

12   responsibility; and following what happened during the riot

13   bothers me as to an appropriate sentence.

14        On the other hand, he has filed a letter, after

15   retaining counsel, apologizing to the police, indicating his

16   regret for what's happened; and as indicated, I think, in

17   his presentence report as well, as to his regret to having

18   been involved in this type of process.  He has now gotten

19   employment and is seeking to go to a trade school, which I

20   think he needs to do to get himself settled and calm down.

21        But I am concerned, as I've said, about his

22   conduct and how that can be appropriately accounted for.  I

23   think if he was older and had understood, I think, more of

24   what he had done he would deserve time in jail.  But I don't

25   like not having a way to control his activities in the

1  future; I am concerned about giving strictly just a sentence

2  in jail.

3          With that background, I will hear from the

4  government; and I will hear from Ms. Jacob as well.

5          MR. STRAIN:  Thank you, Your Honor.

6          Given that binary decision that we have, the

7  government believes a more appropriate sentence would be a

8  sentence of incarceration rather than probation; and, Judge,

9  I would like to start with the letter.

10         I mentioned in my sentencing memo that the letter

11  was drafted in anticipation of sentencing; and that was an

12  inartful way for me to say it.  I received the letter a week

13  or so before our memos were due; and that's how I perceived

14  it.  And, to be honest judge, I have no idea when the letter

15  was written; and so I would like to just make that clear for

16  the record.

17         But, Your Honor, the Court has very well

18  summarized the main facts of this case.  What happened on

19  January 6th was terrifying; it was horrible.  And the

20  rioters that day interfered with the most sacred tradition

21  in America, the peaceful transition of power.

22         Everyone who participated on that day needs to be

23  held accountable including Mr. Wiedrich, who traveled from

24  Utah to Washington, D.C. to attend the Stop the Steal rally

25  organized by President Trump.

1          And, on that day, he attended the rally and then
2     marched to the Capitol.  And when he arrived on the grounds,
3     as you mentioned, he witnessed people bypassing police
4     barriers, police officers, flash bangs.  He stated that he
5     was shot with rubber bullets and hit with tear gas.  Despite
6     this, he encouraged the crowd and pushed forward, screaming
7     things like:  Charge the motherfucker! -- and We ride for
8     Trump!  We die for Trump!
9          He then makes his way to the Senate wing doors.
10    There is a broken window next to the Senate wing doors that
11    he yells at police through and hangs from.  He does
12    eventually enter through the Senate wing doors just behind a
13    crowd that physically pushed through against officers who
14    had created a barricade with furniture.  He was cheering; he
15    was screaming; he was yelling at the police; and then he
16    entered the crypt and stole a decorative American flag.  And
17    he's later seen walking through the House wing, and in the
18    Hall of Columns; and he exits through the south doors with
19    that American flag.
20         Essentially, he walked across the entire building.
21    From the Senate wing to the south doors, it's across the
22    entire building.  He was inside for approximately 20
23    minutes.  The flag was recovered from his room when the
24    search warrant was executed.  We do plan to return that flag
25    to the Capitol.

1          He was interviewed by the FBI and, to his credit,

2     he voluntarily submitted to an interview.  That was on

3     January 16th, so ten days after the riot.

4          Unfortunately he told some lies during that

5     interview.  One was that he saw no resistance by police from

6     the crowd entering the Capitol Building; that was false.  He

7     was right behind a crowd that pushed through a barricade.

8          He said that he observed no property damage; well,

9     that was false because he was yelling through a broken

10    window.  And then he told the FBI that he walked ten feet

11    inside, and then turned around and left; and that's false,

12    he walked across the entire building.

13          But, Judge, I will say in mitigation, the

14    defendant has been cooperative.  Like I said, he interviewed

15    with the FBI; he didn't have to, but he did.  He complied

16    with the conditions of his release.

17          Before I submit, I just want to mention again this

18    statement that sticks out to me as being very unique:  We

19    ride for Trump!  We die for Trump!  This statement, in its

20    context, is extremely disturbing.

21          The defendant was attending a Stop the Steal rally

22    believing that the election was fraudulent and had been

23    stolen.  And we often hear about people, like soldiers and

24    law enforcement, being willing to give their lives for their

25    country.  I think this is the first I have ever heard an

1    American say that they would die for a political candidate;

2    and maybe this is common in other countries, like

3    dictatorships and monarchies, but not in America.  This was

4    said in the context of an attack on the Capitol Building

5    where the transition of power was taking place.

6            All of these things point together to a clear

7    message that Mr. Wiedrich was unhappy with the election

8    results and wanted to overturn them because his political

9    candidate didn't win; and, to that end, he engaged in

10   violence.  So given these factors, and given the Court's

11   ruling, the United States is recommending three months of

12   incarceration.

13           THE COURT:  I appreciate it.

14           Mr. Strain, I thought that your memo was very

15   helpful, including the chart that you provided behind that,

16   as it related to cases that are somewhat similar to this

17   case.  I had just taken an opportunity to try to distinguish

18   some of those matters.

19           Mr. Wiedrich, this case concerns me, as I

20   indicated from the beginning, as to a proper resolution for

21   a sentence that would be appropriate.

22           As I said before, and as I have indicated again, a

23   plea to a misdemeanor in this circumstance does not, in any

24   way, implicate at all that the Court should automatically

25   give probation; I think that's a misunderstanding that the

1    defense bar has, but that's not what is to be expected in

2    these cases.

3            I think there are cases appropriate for probation,

4    where there are minor participants who were caught up in

5    this -- involved planning and foresight, but without

6    cheering on the attempted taking of the Capitol Building.

7            Mr. Wiedrich's case concerns me in the sense that

8    his -- in that I am not able to have probation if I sentence

9    him to jail.  I think there really is a need to see where he

10   is going at this difficult time.

11           All right.  Let me hear from Ms. Jacob at this

12   time.  Thank you.

13           MS. JACOB:  Thank you, Your Honor.

14           The defense recommendation of probation, with the

15   condition that he serve two months of home detention, takes

16   into account some of the Court's concerns here, which --

17   there are a couple of aggravating factors that, I agree,

18   separate him from some of the most minor participants in

19   other cases.  However, I would like to try to explain some

20   of the conduct that day.

21           Mr. Wiedrich -- he was only 23 years old when he

22   decided to go to D.C. to attend that rally.  Shortly before

23   January 6, 2021, he heard the former -- President Trump make

24   a statement explaining that he needed everyone's support at

25   that rally; and that statement is what prompted Mr. Wiedrich

1    to spontaneously buy a plane ticket and travel alone with

2    really no idea where he was going to stay that night.  No

3    hotel reservation; he was winging it.

4         He attended the rally; he heard the speeches.  He

5    was influenced by the energy of the crowd.  He, like many

6    others, actually believed that they, by protesting, could

7    convince Mike Pence to reject the certification of the vote;

8    and that's what motivated him to follow the crowd to the

9    Capitol Building.  When he got there, he continued to feel

10   the energy of the crowd as people charged toward the

11   building.

12        He got carried away, Your Honor; he followed them.

13   And he made some statements -- he recorded them -- based on

14   this, you know, spontaneous energy that -- he believed he

15   was following people who were older than him, and who he

16   thought knew what they were doing.

17        He entered through the Senate doors -- the Senate

18   wing doors -- about 25 minutes after that area had initially

19   been breached; so he didn't see the first people who broke

20   those windows.

21        He also did not see the violence that occurred on

22   the West Terrace.  He was behind a crowd who did push pass

23   officers, that is correct; but he himself did not push an

24   officer.  He was inside for about 20 minutes, and he left.

25   He unfortunately took a flag -- however, did not destroy

1   that flag and did not damage it.  It was returned safely to

2   the FBI.  He did this on a whim, without thinking, and

3   sincerely regrets this and all of his actions that day.

4          Now, the government suggests that jail time is

5   appropriate for a few different reasons, including one of

6   the Court's concerns as well, that he was -- that they

7   believe he was dishonest with the FBI when they came to his

8   house two weeks -- ten days after January 6th.  This

9   interview was not recorded; he did not have a lawyer

10   present.  And so this report that we have is a summary of

11   their understanding of what Mr. Wiedrich told them.

12          At the time, he was 23 years old with no college

13   education; and he was nervous and scared.  And he, of

14   course, did not articulate himself properly, which is a

15   perfect example of why lawyers should be present at these

16   interviews.  Despite all of this, he did make some

17   statements that he regrets.  However, he did believe that he

18   told them that he walked around a little bit; but, again,

19   this was not recorded, so things may have been

20   misunderstood.

21          He explained to them that he personally did not

22   witness violence because, in his mind at the time, violence

23   meant something different than shouting at an officer or

24   pushing past an officer.  A lot of people don't understand

25   that pushing an officer is an assault.

 1          And so -- and he also -- he explained that -- the

 2     Snapchat is where he said that he was hit by rubber bullets;

 3     however, he didn't offer this to the FBI that day because it

 4     wasn't true.  He was simply trying to appear important to

 5     his friends.  He was not hit by rubber bullets that day; he

 6     was not hit by tear gas.

 7          And so unfortunately, Your Honor, this is

 8     something that is a problem with social media these days;

 9     and it's a problem especially with individuals as young as

10     Mr. Wiedrich.  People unfortunately feel the need to narrate

11     their thoughts and actions to the world, and it's not always

12     a true representation of what happened or how they feel.

13          And, Your Honor, the same goes for that video that

14     the government submitted the day -- that shows him the day

15     after making an unfortunate statement.  At that point he had

16     absolutely no idea that people lost their lives on

17     January 6th; he didn't learn until a couple of weeks later.

18     And now he looks back on that statement and is embarrassed

19     because he knows it was a stupid thing to say.  But he did

20     not know that people lost their lives; and I don't think

21     that he would have made that same statement had he known.

22          THE COURT:  I think he was referring to the media

23     report of an officer -- the lady that was killed; he didn't

24     know that happened.

25          MS. JACOB:  Yes, Your Honor.

1    And I am referring to the statements he made on

2    Snapchat where he compared this to the Black Lives Matter

3    protest where he believed at the time that more damage had

4    been done by those protests.  But he didn't know the extent

5    of the damage that had been done at the Capitol Building at

6    that time that he made that statement.

7        Your Honor, in fact, he realized pretty quickly

8    that he needed to stop trying to impress his friends and

9    focus on his personal growth and his life, which is why he

10   stopped making statements on social media; and he, rather,

11   found stable employment; he got an apartment of his own, and

12   he has serious goals now.  He would like to go to trade

13   school; and he wants nothing to do with this world that he

14   was once a part of.

15       Your Honor, the government also feels that jail

16   time is appropriate because they feel that that video was --

17   revealed a lack of remorse.  However, I think that this

18   fails to take into account several circumstances that should

19   be factored into this consideration.  He accepted

20   responsibility less than one month after he was charged.  He

21   pled guilty; and he admitted his conduct before a court.  He

22   stopped posting on social media almost immediately after --

23   following January 6th.  And he wrote a letter to the Capitol

24   Police that was sincere and recognized the fact that he did

25   not at the time understand the severity of what he was

1    doing, but that now he does.

2         There is obviously remorse here.  And, Your Honor,

3    he continues to show remorse.  He sincerely, sincerely

4    regrets his actions; he just wants to focus on his growth at

5    this point in time.  He is the one suggesting to the Court

6    that he will do 100 hours of community service, which is no

7    little feat.  I mean, that's a lot of time that he's going

8    to have to spend on the weekends and after work; but that, I

9    think, is a much more appropriate and effective way to --

10   for Mr. Wiedrich to rehabilitate here -- as well as two

11   months of home detention, which is a restriction on his

12   liberty.

13        Your Honor, I don't think that those two things

14   are going to be easy for him to do; and I don't think it's a

15   slap on the wrist.  And I think it will allow the Court to

16   also continue to supervise him.  So, Your Honor, that's why

17   we think that that recommendation is more appropriate than

18   jail time that I just don't think will be productive in this

19   case.

20        And Your Honor, Mr. Wiedrich -- he did submit that

21   letter apologizing.  He would like to -- for the Court to

22   accept that as his allocution today as well.

23        THE COURT:  All right.  I have had a copy here now

24   handed to me, in front of me.  I am not -- (unintelligible);

25   and it's referring to the letter to the police.

1          MS. JACOB:  Yes, Your Honor.

2          THE COURT:  That was written after he had counsel?

3          MS. JACOB:  Yes, Your Honor; but it's something he

4     has been working on a long time.

5          And, you know, like I previously explained to the

6     Court, he has been separated -- he has been making a lot of

7     progress separating himself from that world that he was in

8     before -- when he was constantly on social media and

9     focusing on things that he shouldn't have been focusing on,

10    rather than himself and his personal growth.

11         So when he wrote this letter, it was sincere; and

12    it wasn't just because he was being sentenced by the Court

13    today.  It was something he wanted to do and -- because he

14    realized that he didn't know the severity of what he was

15    doing at the time.  And now that he had the chance to

16    reflect on it, he sincerely believes that those officers

17    went through a lot that day and that they deserved an

18    apologize.

19         THE COURT:  You know, I am concerned in that it's,

20    sort of, like a conversion; when you are faced with the

21    death penalty, or something, you become converted very

22    easily.

23         Judge Lamberth sentenced a woman a while ago who

24    had actually through her lawyer had gone to, like, civics

25    courses; had watched a series of movies about problems that

1    people have to face in life -- difficulties with fascist

2    regimes, et cetera -- and was truly repentant for her views,

3    for everything she had done; and he put her on probation.

4    Within weeks she went on a Fox news broadcast and put forth

5    her opinions of people on there, and said it was simply a

6    lovely afternoon and nothing happened.  She was already on

7    probation, and nothing could be done about it.  That has

8    concerned me.

9         And I have said before in sentencings that I am

10   very concerned with the pleas that they're getting.  Is this

11   a mechanism to put this behind them, or are they truly

12   recognizing that they have done something terribly wrong?

13   That has concerned me in many of these cases.

14        I have got Mr. Wiedrich's -- I am not sure I'm

15   pronouncing it correct -- statement to the police.  I did

16   want to say something today about what concerns me a little

17   bit -- where he is, and what he is really thinking about;

18   his future involving political matters.  I really don't know

19   if he understands that following, he said, Mr. Trump's call

20   to rally, and then these other individuals who were in the

21   Capitol Hill riot that attacked the police -- this is

22   clearly one of the most serious offenses that has probably

23   occurred in the history of the United States; that it is a

24   total tragedy which will affect this country for many, many

25   years.

1      But it is concerning to me that many of these

2  people who have been charged -- are they really focused on

3  what happened; what their role was; how they are perceived

4  in the future when there is another election?

5      At the same time, he is a young man who I think

6  has a lot of potential.  He's gotten through school with

7  some difficulties.  He has now settled down with a job and

8  independent living.  He has vocations he wants to get

9  further trained in which I think would be good for him to

10  make a good living, a good skill.  I want to see him have

11  that opportunity; but he has to understand the seriousness

12  of his offense, which is something that I think will be a

13  stain, I think, for him for the rest of his life, having

14  participated in this riot.

15      We are unfortunately faced with people -- many are

16  politicians -- providing a false narrative as to what really

17  happened at the Capitol that day and who continue to mislead

18  people as to the wrongdoing that occurred.  I am terribly

19  afraid many of these people involved in the riot will follow

20  that false narrative, as they have before, and continue to

21  believe that what they did was justified and appropriate.

22      I don't know how you move forward on that but by

23  making them face incarceration, understanding what they did

24  was -- that's what they should be in jail for, face reality,

25  and understand that what they did was not only a serious

1    offense but, I think, in some ways, is really unforgiveable

2    for having conducted themselves in that manner, attacking

3    the democracy -- really, the basis of democracy in the

4    United States.

5           All right.  So, Mr. Wiedrich, you don't have

6    anything else to say at this time except for that letter to

7    the police; is that correct?

8           THE DEFENDANT:  Yeah.  I just -- I don't have much

9    more to say other than I have started trade school.

10          And if you take away the politics of what happened

11   on January 6th, at the end of the day, breaking American

12   property is not acceptable.  And I do look back, and I do

13   regret that day sincerely.  It will be a stain on my life.

14          I'm trying to bounce back a little bit, you know,

15   take it day by day; focus more on personal growth, like my

16   lawyer said.

17          And if -- you know, I am -- I am -- what's the

18   word -- passionate about politics, but I intend on doing it

19   the right way from hereon out, doing local -- local school

20   meetings and more local politics.

21          THE COURT:  Well, I think -- I hope that you

22   understand that you have got to really understand the issues

23   fully on both sides and not follow false information as you

24   make your decisions about politics.

25          It really is, for me, such a serious situation we

1    face with these individuals that attacked the Capitol; one

2    that is hard for me to not feel that most individuals need

3    to be given jail time and face what they did to get them to

4    think and reflect about what politics they're following, and

5    make sure what they're following is accurate and true.

6           All right.  I am going to do as follows in this

7    case, Mr. Wiedrich -- but I have made my point clear, I

8    think most of these cases should result in jail time with

9    some exceptions in some minor cases.

10          In your case it will be a little bit different at

11   this time.  I am guided obviously by the statutory outline

12   for sentencing procedures at 18 3553(e) that I look to; a

13   sentence that is to impose sufficient, but not greater than

14   necessary -- a sentence to comply with the following

15   purposes -- and I have to consider each of these, and I have

16   done that.

17          Actually, counsel on both sides -- counsel for the

18   government and your counsel -- have done a very good job of

19   reflecting on the seriousness of the offense and respect for

20   the law, proper punishment; deterrence from future criminal

21   conduct; protect the public from any further crimes; provide

22   you with any needed educational or vocational training or

23   medical care.

24          The Court must consider the following factors:

25   The nature and circumstances of the offense -- the

1    government reviewed that, along with your counsel very well;

2    your own history and characteristics, and the types of

3    sentences available.

4            I find myself somewhat cabined, that is, limited

5    by the sentences available to the Court because it's a

6    Class B misdemeanor.  The government accepted that as a

7    plea; and that limits me to jail or probation in my view of

8    the law.

9            I have reviewed the policy statements; and I have

10   reviewed some of the factors we have considered in these

11   particular kind of cases on the format that Chief Judge

12   Howell has laid out, which I think is very useful -- I have

13   looked at those factors for your involvement; the need to

14   avoid unwarranted sentence disparities; the need to provide

15   restitution, which we have to do in this case.

16           All right.  Considering those factors, I am going

17   to give you the following sentence -- I am not going to

18   sentence you to incarceration or jail.  My inclination is to

19   do that; but all I do by that is give you a month -- 30, 60,

20   90 days in prison -- you walk out after you finish your

21   short prison sentence at a local jail -- I assume perhaps

22   out there, or maybe you get assigned to an institution for a

23   few months -- and then you are free; there is nothing else;

24   you are not responsible to the Court for anything.

25           I think it's far better to put you under some

1    restrictive probationary terms for a long period where I can

2    be assured that you will not turn back into a violent

3    political protester again; that you will do your politics as

4    other normal people do their politics, by getting involved

5    in politics properly; making sure that what you are doing is

6    appropriate and that it is based in the truth; and the facts

7    support your position.

8           Under the Sentencing Reform Act -- which is

9    generically applied because it is not a felony, it does not

10   apply directly in this case -- under the 18 U.S.C. 3553

11   provisions it will be the judgment of the Court that

12   Jacob Kyle Wiedrich will be sentenced to probation in the

13   following way:

14          First, you will be sentenced to three months of

15   home detention -- and I am going to discuss what that will

16   be with you in a minute -- and then you will be on three

17   years of probation.  I am purposely making the probation to

18   cover the next general election, in 2024, to ensure you do

19   not fall victim to following false Gods again.

20          Three months of home detention will be under the

21   standard provisions we use; that will include location

22   monitoring for 90 days; and you will have to follow the

23   rules and regulations of the location monitoring program;

24   possibly waived because you are going to be in trade school,

25   I hope.  You will be -- location monitoring technology is at

1    the discretion of the probation officer that's available in

2    your jurisdiction.

3            Mr. Strain is from Utah, he may know.  I don't

4    know what is available in the district where you are; but it

5    will either be an ankle bracelet or it may be radio

6    coverage, depending on what is available there and what the

7    probation officer feels is appropriate.

8            They are to monitor and restrict your movements in

9    the community.  You are restricted to your residence at all

10   times, except for your employment, education, religious

11   services, medical or substance abuse, and mental health

12   treatment; or attorney visits or court appearances; or

13   court-ordered obligations such as community service.

14           Once you are finished with the home detention, you

15   are on regular probationary terms that will be provided by

16   the government, the standard probationary terms.

17           You are to have financial information that you

18   will have to disclose and, also, you are going to be ordered

19   to pay restitution in a minute.

20           Now, there is a special assessment of $10 for this

21   conviction; it has to be paid to the Clerk of this Court.  I

22   will waive any fines in this case because you have been

23   unemployed; and I don't think it -- until recently -- and I

24   don't think it's appropriate in your case to be able to

25   afford a large fine.  However, there is restitution due of

1  $500 to the Architect of the Capitol.  I will waive any

2  interest on that and penalties accrued on the balance; and

3  the payments will be made to the Clerk of the Court for the

4  United States District Court for D.C. to disburse, once it's

5  paid, to the Architect of the Capitol for $500.

6         You can work out the monthly payment of that with

7  the probation officer as to your monthly payment.

8         In addition, I am going to place you on 100 hours

9  of community service publically provided as a form of

10 deterrence, in the form of probation and home detention.

11 Community service will be in an area where you can provide

12 some type of service or benefit to others who are less

13 fortunate and in need of help.

14        Now, the $10 is immediately payable to the Clerk

15 of this Court here in D.C.; you will be told how to do that

16 through the probation office.

17        Now, the three years of probation will carry you

18 forward from the time of the sentence until it is completed.

19        Now, let me ask the probation officer:  Do you

20 need any other assistance at this time from me,

21 Ms. Reichler, as to the sentence -- the nature of the

22 sentence?

23        PROBATION OFFICER:  Not at this time from you,

24 Your Honor.  I would just ask that Mr. Wiedrich hang on the

25 line after so that I can read the conditions to him.

1      Thank you.

2              THE COURT:  Did you understand the 100-hour

3      community assignment; three years of probation; three months

4      of home detention under the standard orders for home

5      detention and monitoring.  All right?

6              Now, I am doing this sentence as an exception to

7      what I said my practice would be in these cases to give some

8      incarceration time; I have done that in some of these others

9      cases.

10             In your situation, I am finding an exception

11     because I agree, from reading through the files and

12     materials and discussion on this record, that I think you

13     are a young man easily misled; that you were immature in how

14     you approached this.  You did not really understand -- and I

15     am not sure you still understand -- the serious consequences

16     of your actions; and that your enthusiasm exemplified by

17     your media posts cheering on the riot people, trying to be

18     Patrick Henry apparently; trying to have to justify your

19     actions, comparing them to Black Lives Matter -- are

20     terribly regretful; but, at the same time, I think it

21     reflects your immature attitude.  It's very different from

22     others I have seen who made after-riot statements cheering

23     on the violence, and much more extreme passions.

24             I don't see any further postings from you.  The

25     government has brought to my attention your social media

1    that you continued on this, once you had talked to the FBI

2    and realized what had happened.  I hope I don't see the

3    continued situation that I referred to earlier; like this

4    one with Judge Lamberth, the lady who totally reversed her

5    position.

6              I think it's justified in your situation to get

7    probation; although, as I said, I don't think it is

8    justified in most situations to do that in these cases.

9              So that will be the sentence of the Court.

10             Any other questions about the sentence or

11   additions to be made by either counsel in this case?

12             PROBATION OFFICER:  Your Honor, I just have one

13   final question.  I know you are going to transfer

14   supervision; but are you maintaining jurisdiction?

15             THE COURT:  Yes.  I will maintain jurisdiction in

16   this case.  Supervision will be through the Utah probation

17   office.  If there is a violation, it will come back to me.

18             PROBATION OFFICER:  Correct.

19             MR. STRAIN:  And I have nothing else, Your Honor.

20   Thank you.

21             THE COURT:  Thank you.

22             MS. JACOB:  No questions from me at this time,

23   Your Honor.  Thank you.

24             THE COURT:  All right.  I need to advise you,

25   Mr. Wiedrich, you have a right to appeal this sentence.  You

1   have a very good lawyer representing you who understands

2   that I have not gone over the maximum sentence; I have not

3   otherwise changed the sentence from the plea agreement in

4   any fashion.  But if you still wish to appeal, you have 14

5   days from the day I enter the judgment in this case.

6            Now, you will be transferred for the -- to have

7   this handled by the probation office in Utah.  However, I

8   will continue to exercise jurisdiction of the case; and if

9   there are any violation terms it will come to me because I

10  am very familiar with your case.  I want to make sure I am

11  advised if there are any other issues.

12           Mr. Wiedrich, I think you ought to look upon this

13  as a chance and that you take advantage of this chance,

14  because if something like this happens again with you --

15  either locally, in Utah, or through any demonstrations that

16  are improper that brings you back here to attempt to

17  override the vote of the people -- it will then result in

18  very serious consequences.

19           You have been given an opportunity, young man, to

20  go out and try to succeed in your work and your life; take

21  advantage of that opportunity.

22           THE DEFENDANT:  I understand.  Thank you, Your

23  Honor.

24           Trust me, I will.  I plan on running with this

25  momentum I have right now; so I appreciate you not locking

1    me up.

2              THE COURT:  All right.

3              THE DEFENDANT:  Thank you.

4              THE COURT:  All right.  Thank you.

5              Counsel, that will be the sentence of the Court.

6    I appreciate your attendance.

7              MS. JACOB:  Thank you, Your Honor.

8              THE COURT:  You are excused.

9              MR. STRAIN:  Thank you, Your Honor.

10             PROBATION OFFICER:  Thank you, Your Honor.

11             (Whereupon, the proceeding concludes, 11:44 a.m.)

12                        **CERTIFICATE**

13             I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
14   transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
15   ability.

16             PLEASE NOTE:  This hearing was held via
     videoconference and/or telephonically in compliance with the
17   COVID-19 pandemic stay-safer-at-home recommendations and is
     therefore subject to the limitations associated with the use
18   of technology, including but not limited to telephone signal
     interference, static, signal interruptions, and other
19   restrictions and limitations associated with remote court
     reporting via telephone, speakerphone, and/or
20   videoconferencing capabilities.

21             This certificate shall be considered null and void
     if the transcript is disassembled and/or photocopied in any
22   manner by any party without authorization of the signatory
     below.

23
               Dated this 26th day of January, 2022.
24
               /s/ Elizabeth Saint-Loth, RPR, FCRR
25             Official Court Reporter